### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| CARY MOORE, | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| PENFED TITLE, LLC, *et al.,* | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Case No. 1:20-cv-0867
Hon. Liam O'Grady

## I.   MEMORANDUM OPINION AND ORDER

Before the Court is a motion for summary judgment (Dkt. 22) filed by Defendants PedFed Title, LLC and Pentagon Federal Credit Union (hereinafter "PenFed"). For the following reasons, PenFed's motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.   BACKGROUND

### A. Mr. Moore's performance and compensation at PenFed Title

Plaintiff Cary Moore "was hired and started work on October 2, 2017 as PenFed Title's Vice President, Title & Settlement Operations." Dkt. 28, at 4. His duties "included responsibility for operations and business development for [PenFed Title's] Reston office and overseeing the management of the title and settlement operations of the affiliated companies in Texas and California . . . ." *Id.* His starting salary "was $140,000 per year plus 15% in commissions of the net revenue from the business he generated." *Id.* He was designated as an "M-Class Employee" in PenFed's compensation system. *Id.* at 4–5. His immediate supervisor, Mr. Shashi Vohra, authorized his hiring and set his compensation. *Id.* at 4.

Mr. Moore quickly expanded PenFed's business. *Id.* at 5. In turn, he almost immediately sought an increase in his compensation. *See id.* at 5–7. At first, he was told that he could not

1

receive a spot bonus less than six months after being hired. *Id.* at 6. Later, he was denied a year-end bonus on the grounds that he was receiving a commission. He subsequently discovered that this explanation was false; his subordinates, who were receiving commissions, had received a year-end bonus. This chagrined Mr. Moore.

Mr. Moore's campaign to earn more money continued. On several occasions in 2019, Mr. Moore unsuccessfully sought performance evaluations from his supervisor, Mr. Vohra. *Id.* Mr. Vohra's refusal to provide a performance evaluation inhibited Mr. Moore's eligibility to obtain a merit-based increase in his salary. This augmented Mr. Moore's frustration.

With his compensation in a state of apparent stagnation, Mr. Moore complained to Human Resources (HR) that "he was being discriminated against based on his race." *Id.* at 6. At some point in response to his inquiry, HR informed him that his salary was below the "midpoint" level of the salary range for M-Class employees at PenFed. *Id.* at 7. This information stoked his pay-related grievance.

### B. Mr. Moore's alleged harassing conduct at PenFed Title

Mr. Moore's conduct during his tenure at PenFed was less then exemplary in certain respects. Within six months of joining PenFed, one of his employees resigned. *See* Dkt. 28, at 12. In this employee's Exit Interview Questionnaire, she described Mr. Moore's workplace behavior in a negative light:

> I decided to start seeking alternative employment when I felt that I could no longer trust [Mr. Moore]. There had been several instances when I was told by my manager to go against something our underwriter was saying. . . . I also heard through the grapevine that he had several lawsuits [brought] against him, one being sexual harassment case. . . . He also made me feel uncomfortable when he told me to take his coffee cup to the kitchen and then laughed about it . . . and did the same thing to two other females in the office. He also made the comment that if it were legal, he would beat his wife for spending money. Both actions combined is [sic] not something I feel comfortable with . . . Lastly [Mr. Moore] is constantly doing work for another company . . . and makes those phone calls . . . during work hours.

*Id.* HR investigated the business ethics concerns that were raised but did not probe the

employee's complaints about Mr. Moore's harassment. *See* Dkt. 28-23, at 6–12.

Ironically, Mr. Moore lodged his own complaints about harassment, albeit on behalf of

another female employee. One of Mr. Moore's direct subordinates, Kerry Brandon, was

managing PenFed's affiliated title business in Texas, Members Title of Texas. Dkt. 28, at 9–10.

Through Mr. Moore's interactions with Ms. Brandon in 2018, he learned that the President of

PenFed Realty of Texas, Russell Rhodes, "repeatedly engaged in abusive behavior toward [Ms.

Brandon], including speaking to her in a condescending tone and making derogatory remarks,

including referring to her as a 'dumb blonde' and 'nitwit.'" *Id.* at 10. Mr. Moore, in turn,

confronted Mr. Rhodes, urging him to "cease the abusive treatment." *Id.* Mr. Moore also

reported Mr. Rhodes to PenFed HR. *Id.* Mr. Moore's efforts to "protect" Ms. Brandon

ultimately fell short. Mr. Rhodes's abusive conduct persisted until Ms. Brandon resigned her

position in August 2019.

On November 7, 2019, shortly after Ms. Brandon resigned (and while Mr. Moore was

still diligently seeking an increase in his compensation), PenFed HR received a call from the

spouse of the former employee that had resigned in 2018. *Id.* at 11. The spouse reported that

based on recent conversations with current PenFed employees, Mr. Moore's harassing conduct

was continuing. Mr. Moore was apparently referring to the "women in the office as work wives

and sister wives," and was telling them that "he doesn't get enough attention at home, so he

expects to receive attention from them at work . . . ." *Id.* at 13.

This call prompted PenFed to launch an investigation into Mr. Moore's conduct. Delia

Cook of PenFed's Human Resources Department took the lead. She interviewed six employees

under Mr. Moore's direct supervision. These employees gave statements that, in aggregate,

3

evidenced a pattern of sexual harassment by Mr. Moore, at least in the view of PenFed. Mr. Moore was interviewed briefly about his conduct before being placed on leave and terminated in December 2019. Two weeks later, he obtained a higher paying position as Vice President of Operations at First Title, a competing Title Company.

### C. Procedural History

On July 29, 2020, Mr. Moore filed a three-Count complaint against PenFed, alleging Title VII unequal compensation discrimination (Count I), Title VII wrongful termination (Count II), and Title VII retaliation (Count III). *See generally* Dkt. 1. The Parties engaged in discovery, and PenFed filed a motion for summary judgment on April 13, 2021. Dkt. 22. Mr. Moore filed an opposition, Dkt. 28, and PenFed filed a reply, Dkt. 29. The matter is now fully briefed and ripe for review.

### III.   <u>LEGAL STANDARD</u>

Summary judgment will be granted where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Marlow v. Chesterfield Cty. Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). As the Supreme Court has held, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247–48) (emphasis in original). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."

4

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015).

## IV.   DISCUSSION

Absent direct evidence of discrimination, Moore must employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*. *See Matias v. Elon Univ.*, 780 F. App'x 28, 30 (4th Cir. 2019) (citing *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973))). The *McDonnell Douglas* burden-shifting framework is designed to elucidate pretextual discrimination in the absence of "conduct or statements that both reflect directly the alleged discriminatory attitude [of an employer] and that bear directly on the contested employment decision." *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006).

Under the *McDonnell Douglas* burden-shifting framework, once a Plaintiff establishes the elements of a *prima facie* case, the burden shifts to the Defendant employer to proffer evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action. See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer carries its burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered" were pretextual. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). A "plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 148 (2000).

Mr. Moore urges the Court to analyze his claims under the *McDonnell Douglas* burden-shifting framework. *See* Dkt. 28, at 1 (citing *Burdine*, 450 U.S. at 253). The Court will proceed accordingly.

## A. Unequal Compensation Discrimination in Violation of Title VII (Count I)

To establish a *prima facie* case of Title VII unequal compensation discrimination, Mr. Moore must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Williams v. Carolina Healthcare Sys., Inc.*, 452 F. App'x 392, 394 (4th Cir. 2011) (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)).

The Parties do not dispute that Mr. Moore is a member of a protected class or that his job was performed satisfactorily. In turn, Mr. Moore identifies three potential "adverse employment actions" that he suffered with respect to his compensation: (1) that he was paid a relatively low salary due to PenFed's race-based discrimination against him; (2) that he was wrongfully denied a 5% year-end bonus, even though other PenFed employees with similar compensation schemes received that bonus, and; (3) that his supervisor "refus[ed] to perform an evaluation for Mr. Moore [which] precluded a bonus or merit increase [to his salary]." *See* Dkt. 28, at 23–25; *id.* at 3.

Assuming, without deciding, that these three proffered grounds constitute "adverse employment actions" for purposes of a Title VII unequal compensation discrimination claim, Count I must nonetheless fail because Mr. Moore cannot satisfy the fourth prong of his *prima facie* case. *See* Dkt. 29, at 1–4.

Looking first at Mr. Moore's complaint about his overall compensation, he identifies two potential comparators outside his protected class: M-Class employees Kerry Brandon and David Masci. *See* Dkt. 28, at 23. These employees, each of whom made less than Mr. Moore,[1] were

---

[1] Neither Ms. Brandon nor Mr. Masci were paid more than Mr. Moore. *Compare* Dkt. 23-9, at 3 (Kerry Brandon made $137,250.65 in annual compensation), *and* Dkt. 28-21, at 58 (David Masci made "approximately" $143,000 to

6

Vice Presidents of affiliated PenFed Title Businesses in Texas and California, respectively, during the relevant timeframe. *See* Dkt. 28-1, at 1. Neither Ms. Brandon nor Mr. Masci were similarly situated to Mr. Moore. As the Fourth Circuit explains:

> While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (internal quotation marks omitted); *see also Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (stating that a "variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications."). While Title VII's "similarity" requirement demands less of plaintiffs than the Equal Pay Act's "equality" requirement, it is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in *all respects*.

*Spencer v. Virginia State Univ.*, 919 F.3d 199, 207–08 (4th Cir.), *as amended* (Mar. 26, 2019), *cert. denied*, 140 S. Ct. 381 (2019) (emphasis in original); *see also Austen v. HCA Health Servs. of Virginia, Inc.*, 5 F. App'x 253, 254 (4th Cir. 2001) ("[Plaintiff], however, was not similarly situated to these female employees. He had . . . more supervisory authority than the female employees . . . ."); *Monk v. Potter*, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010) (citing *Lightner v. City of Wilmington, North Carolina*, 545 F.3d 260, 265 (4th Cir.2008)) ("In satisfying the requirements of elements two and three, Plaintiff must show that the other employees outside the protected class were 'similarly situated' in all respects. For example, two employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated.") (internal citations omitted).

---

$145,000 in annual compensation), *with* Dkt. 23-9, at 3 (Mr. Moore made $147,084.00 in annual compensation); *see also* Dkt. 28, at 11, ¶ 6. Though "[a]n employer can discriminate against its highest paid employee by preventing [the employee] from earning as much as a [similarly-situated] non-protected employee would have earned under identical facts," *Hernandez v. Data Sys. Int'l, Inc.*, 266 F. Supp. 2d 1285, 1298 (D. Kan. 2003), no evidence shows that Ms. Brandon or Mr. Masci would have made more than Mr. Moore "under identical facts." *Id.*

Mr. Moore was Ms. Brandon's "immediate supervisor," even though Ms. Brandon officially reported to Mr. Moore's supervisor, Mr. Vohra. *See* Dkt. 28-21, at 58 ("Q: And in fact, [Ms. Brandon] reported to you, correct?  Mr. Moore: Correct."); Dkt. 28-2, at 1, ¶ 3 ("[Ms. Brandon:] My immediate supervisor was Cary Moore"); *id.* at 3, ¶ 11 ("[Ms. Brandon:] Mr. Moore was a very supportive and professional supervisor.  In fact, in 2018 I texted him wishing him a 'Happy Bosses day.'"); Dkt. 28, at 7 (Mr. Moore describing Ms. Brandon as a member of "his staff").  Ms. Brandon and Mr. Masci were similarly situated. *See* Dkt. 28-1, at 1; Dkt. 28-2, at 1; Dkt. 29, at 2 n.1.

By contrast, Mr. Moore was "Vice President of Title Operations, responsible for the supervision of title and settlement operations for PenFed Title headquarters in Reston, Virginia *as well as the affiliated companies in Texas and California.*"  Dkt. 28-2, at 1, ¶ 3 (emphasis added); *see also* Dkt. 28, at 34 ("[Mr. Moore's] responsibilities in his position with PenFed Title was to oversee [sic] all functions for title insurance settlement/escrow for *three branches*, general office management, employee management, production management for both title and escrow departments, process development and management, business development, vendor management, financial management, risk management, and license and regulation management.") (emphasis added).  Even Mr. Moore recognizes that Ms. Brandon and Mr. Masci are inapt comparators in terms of job responsibility. *See* Dkt. 28, at 23 ("Mr. Moore had substantially more responsibility and generated substantially more revenue than Ms. Brandon and Mr. Masci, two Caucasian employees."); *see also* Dkt. 28-21, at 58 ("Q: And did [Ms. Brandon] have the same level of responsibility as you?  Mr. Moore: No.  She was responsible for the State of Texas and her locations within that state.  I was in charge *of the entire PenFed Title family.*") (emphasis added).

8

In short, Mr. Moore cannot make out the fourth *prima facie* element of a Title VII unequal compensation discrimination claim with respect to his overall salary. His argument boils down to an objection that he was not awarded enough of a premium above all other PenFed Title employees for his unique role within the organization. In this respect, the Court will not second guess PenFed's compensation decisions absent a *prima facie* showing of compensation discrimination. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).[2]

For the same reason, Mr. Moore's complaint that he was not afforded a 5% year-end bonus must fail. *See* Dkt. 28, at 2, 7; Dkt. 28-1, at 2–3.

Mr. Moore explains that his supervisor, Mr. Vohra, denied him a 5% year-end bonus on false pretenses; that Mr. Vohra told him that "those who receive commission are not entitled to bonuses," even though employees receiving commissions did, in fact, receive bonuses. Dkt. 28-1, at 2–3. As impolitic as this explanation may have been, Mr. Moore marshals no evidence that any similarly situated employee was afforded the 5% year-end bonus that he did not receive. As already noted, Ms. Brandon cannot serve as an apt comparator. The other employees Mr. Moore implies were "similarly situated," Kristina Pugh, Ron Reidell, and Brand Day,[3] all served vastly different roles within PenFed Title, and each made roughly $56,000 a year in total compensation. *See* Dkt. 23-9, at 3.

---

[2] Even assuming the 2019 Annual Salary Grade chart (Dkt. 28-11) applies to PenFed Title, Dkt. 28, at 23; Dkt. 28-22, at 22–23, Mr. Moore nowhere demonstrates that PenFed's salary *range* for his position mirrored the distribution of actual salaries *received* by eligible M-Class employees. *Compare* Dkt. 28-5, at 1 ("The VP, Title role is currently a grade 13. The range is $118,910 – 202,014, with a midpoint of $162,246."), *with* Dkt. 28, at 23–24 ("[The 2019 salary chart] provides employees in [Mr. Moore's] grade, grade 13, are *entitled* to a salary over $200,000 . . . .") (emphasis added). Mr. Moore's own testimony regarding how PenFed applies its salary range system undermines his legal position. *See* Dkt. 28-21, at 20–21. Specifically, he offered a female employee far less than the lower limit of her applicable salary range, and was informed by PenFed that he had to *increase* her salary to the range baseline. Dkt. 28-21, at 20–21. By Mr. Moore's own reasoning, that female employee would have a triable gender-based discrimination claim against PenFed under Title VII. *See id.*

[3] *See* Dkt. 23-9, at 3. The Court identifies no reference to Brandy Day in the record but will assume Mr. Moore's submission references Brandy Kirby. *See* Dkt. 23-9, at 3.

Finally, Mr. Moore undermines his own argument that he "was treated differently with respect to the *opportunity* to obtain more compensation by the refusal of [his supervisor] to give him a performance evaluation and meet with him to discuss an increase in compensation." Dkt. 28, at 24 (emphasis in original). He attests that his supervisor evaluated and rated *all* other PenFed Title employees. *Id.* ("Mr. Vohra was obligated under PenFed human resource procedures to evaluate and rate *all employees* and did so for his other employees.") (emphasis added). Notably, PenFed Title employed other African Americans at the time.[4] *See* Dkt. 23, at 6 ("Mr. Moore cannot establish intentional discrimination because no [one] at PenFed Title, male or female, African-American or white, made more than Mr. Moore during his employment with the company."). In turn, even though Mr. Moore's supervisor refused to conduct *his* performance evaluation, Mr. Moore cannot reasonably argue that PenFed's decision not to evaluate and rate him was racially motivated. *See, e.g., Mayers v. Shaw Indus.*, 2012 WL 1067663, at *5 (D.S.C. Mar. 29, 2012) (finding that plaintiff failed to show race discrimination where evidence demonstrated he was the only one at the plant denied certain privileges, and that employees of all races were treated better than he); *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 362–63 (4th Cir. 1983) (finding no race discrimination where defendant failed to hire Plaintiff as a nurses' aide, but freely employed other African American nurses' aides). In other words, employees outside of Mr. Moore's protected class did not receive more favorable compensation treatment than those within his protected class.[5]

---

[4] The Court finds this position consistent with Mr. Moore's carefully gerrymandered statements in his opposition brief. *See* Dkt. 28, at 5–6 ("Mr. Vohra repeatedly refused to provide Mr. Moore, the only African American *male who reported to him*, the opportunity to obtain increased compensation despite his excellent performance . . . .") (emphasis added).

[5] This deficiency dovetails with the separate failure of Mr. Moore to identify a similarly situated comparator that was denied a performance review. *See* Dkt. 28, at 24.

Based on the foregoing analysis, the Court must grant PenFed summary judgment on Count I.

### B. Wrongful Termination in Violation of Title VII (Count II)

For Moore to establish a *prima facie* case of Title VII wrongful termination, he must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) that, in spite of his qualifications and performance, he was fired; and (4) that the position remained open to similarly qualified applicants after his dismissal. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998). The Court begins by expressing some doubt that Mr. Moore has made out his *prima facie* case by showing that his specific position "remained open" following his termination.[6] Nonetheless, PenFed forfeited this argument by failing to raise it. *See, e.g., Kinetic Concepts, Inc. v. Convatec Inc.*, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (collecting cases "recogniz[ing] the general principle that a party who fails to address an issue has conceded [that] issue").

Tracking the *McDonnell Douglas* burden-shifting framework, then, the Court determines

---

[6] Mr. Moore never pleaded so or argued this element. *See* Dkt. 1, at 8–9, ¶¶ 42–46; *see generally* Dkt. 28. His position was eliminated after PenFed Title's entire business was shuttered following his departure. *See* Dkt. 28-26, at 11–12 ("Well, we still continued to have a certain amount of PenFed business. However, it started – Mr. Moore had brought his own business, so obviously that business didn't come to the company anymore."); *id.* at 13 ("[Mr. Moore's supervisor] never spoke to us, any of the staff members directly, until June 7th when he told us he was closing down PenFed Title."); *see, e.g., McAdory v. Vail Techs.*, 2017 WL 1822276, at *6 (E.D. Va. May 4, 2017), *aff'd*, 695 F. App'x 730 (4th Cir. 2017); *Freire v. Keystone Title Settlement Servs., Inc.*, 2009 WL 5217033, at *6 (D. Md. Dec. 30, 2009), *aff'd*, 389 F. App'x 306 (4th Cir. 2010). Moreover, one must suspend belief to infer wrongful termination based on race where, as here, (1) Mr. Moore was hired to expand a business, Dkt. 28, at 5; (2) he succeeded, becoming an integral part of the business, *id.*, and (3) he was thereafter fired, resulting in the business's predictable collapse and, by extension, the elimination of his position, Dkt. 28-26, at 13. This is especially true where the same individual at least participated jointly in the hiring and firing of the Plaintiff. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991); Dkt. 28, at 22. Finally, courts in this Circuit have held that the passage of six months while a position "remains open" does not necessarily satisfy the fourth *prima facie* element of a Title VII wrongful termination claim. *See Vessells v. Kaydon Ring & Seal*, 2018 WL 3122454, at *8 (D. Md. June 26, 2018), *aff'd sub nom. Vessells v. Kaydon Ring & Seal, Inc.*, 749 F. App'x 211 (4th Cir. 2019) (granting summary judgment on a wrongful termination claim and observing that six months is "the amount of time that it normally takes to fill a position"). That determination seems particularly appropriate where, as here, an irreplaceable "rainmaker" like Mr. Moore departs, leaving behind a crippled business.

that PenFed has met its burden of offering a legitimate, nonretaliatory justification for the materially adverse action it took against Mr. Moore. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). PenFed cites a pervasive pattern of workplace misconduct on the part of Mr. Moore that was uncovered by an HR investigation initiated in November 2019. A spouse of a former employee catalyzed this investigation by reporting to PenFed that Mr. Moore referred to "women in the office as work wives and sister wives," and told them that "he doesn't get enough attention at home so he expects to receive [it] at work[.]" Dkt. 23-4, at 2. Once set in motion, the investigation revealed that Mr. Moore allegedly threatened to terminate a pregnant woman for leaving the office for lunch without asking him if he wanted something to eat, *see id.* at 2–4, that he stated that he wished it were still legal to beat his wife during a staff meeting, *see id.* at 3; *see also* Dkt. 23-2, at 12, and that he regularly told women in the office to get him coffee and clean his mug, *see* Dkt. 23-4, at 2; *see also* Dkt. 23-2, at 9–10. The workplace under Mr. Moore's supervision was described by his coworkers as a "very sexist environment." Dkt. 23-4, at 4. One female employee reported that Mr. Moore was "constantly staring at her body, breasts in particular, and [wouldn't] make eye contact with her." *See id.* at 5; *see also* Dkt. 23-13, at 5; Dkt. 28-28, at 8–12. Though the Court expresses no opinion on the admissibility of these statements, it finds that PenFed was entitled to rely on them internally in reaching its decision to fire Mr. Moore.

As PenFed has established a legitimate, non-discriminatory justification for its decision to terminate Mr. Moore, the burden shifts back to Mr. Moore to show by a preponderance of the evidence that PenFed's proffered justification was mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802. To succeed, he must identify evidence from which a reasonable fact finder could conclude that PenFed's articulated reason for terminating Mr. Moore is unworthy of

belief. *Harmer v. Virginia Elec. & Power Co.*, 831 F. Supp. 1300, 1308 (E.D. Va. 1993).

Mr. Moore attempts to make this showing by attacking the processes PenFed employed to terminate him. *See* Dkt. 28, at 28 ("Further a jury could find pretext because the decision to terminate Mr. Moore was not reasonably informed and considered decision [sic] and that there are substantial questions about the reliability of the Cook Memorandum, investigative process and decision process."). In short, Mr. Moore insists that PenFed's investigation of his alleged misdeeds was so replete with errors and peculiarities that the specter of pretext looms large. He identifies the following shortfalls:

- His predecessor was fired pursuant to PenFed's progressive disciplinary policy, whereas he was fired abruptly without prior "oral [warnings], written warnings, probation, suspension [or] leave without pay." *See* Dkt. 28-22, at 18; Dkt. 28, at 27; Dkt. 28-13, at 13; *see generally* Dkt. 28-16.

- In 2018, more than a year before PenFed initiated its November 2019 investigation into Mr. Moore's conduct, another employee alleged that Mr. Moore was sexually harassing women in the workplace. Dkt. 28, at 12. Upon receipt of this complaint, PenFed "did nothing." *See* Dkt. 28-23, at 6–9.

- PenFed "did not honestly believe Mr. Moore's conduct justified termination" because its HR personnel "admitted [that] many of the statements made by Mr. Moore were not chauvinistic, distasteful or terminable offenses . . . ." Dkt. 28, at 29.

- "No employee made any complaints about Mr. Moore until [the investigation was launched] in November 2019. *Id.*

- PenFed HR followed no written procedures in conducting the investigation into Mr. Moore. Dkt. 28-24, at 9.

- The notes taken by Ms. Cook during the investigation of Mr. Moore were destroyed. Dkt. 28-23, at 13. Paul Velky, Head of HR at PenFed, indicated that he "personally" would have kept a copy of these notes. *See* Dkt. 28-24, at 10–11.

- Ms. Cook did not interview all potential individuals in the office and included no statements in her Memorandum from one individual she did interview. *See* Dkt. 28, at 31 ("Cook never spoke to Amanda Hall, Anne Gardner, Cheryl Willis, or put a statement in from the Memorandum [sic] with Elizabeth Sturgeon although she listed her as person, she met with. [sic] Amanda Hall, if interviewed would have stated Mr. Moore was her 'best supervisor ever' and 'he always treated me with the upmost [sic] respect and has never created an uncomfortable working environment'").

- Ms. Cook included "things in her Memorandum which she knew were not sexist or harassing." *See* Dkt. 28, at 30.

- PenFed HR personnel could not identify the specific individual that made the final

13

decision to terminate Mr. Moore. *See* Dkt. 28-24, at 7–8; Dkt. 28-25, at 3–4; Dkt. 28, at 21–22, ¶ 31. PenFed claims this decision was made by Mr. Moore's supervisor, but the record indicates that it was a collective decision made by Mr. Vohra, Mr. Velky, and Mr. Heyer. *Compare* Dkt. 23, at 11, *with* Dkt. 28-25, at 3–4, *and* Dkt. 28, at 22 ("There is also evidence that the decision to terminate was made jointly by Mr. Vohra, Paul Velky, and William Heyer, legal counsel for PenFed based on information supplied by Ms. Cook, Ms. Helm.").

"[E]vidence of an obviously inadequate investigation into the employee's misconduct could tend to show that claimed employee misconduct was actually a pretext for prohibited animus." *Villa v. Cavamezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017) (emphasis added). However, "[a]n imperfect investigation alone cannot support a finding of pretext without some evidence that the termination was motivated by discriminatory animus." *Mathews v. Johns Hopkins Health Sys., Corp.*, 2019 WL 3804129, at *5 (D. Md. Aug. 13, 2019) (citing *Brown v. Conopco, Inc.*, 2007 WL 3224586, at *8 (D. Md. Oct. 24, 2007)); *see also Bennett v. New Founds. Children & Family Servs., Inc.*, 2010 WL 517900, at *8 (D.S.C. Feb. 10, 2010) (citing *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989)) (the pretext inquiry "does not convert Title VII into a vehicle for challenging unfair—but nondiscriminatory—employment decisions"). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (citing *Kulumani v. Blue Cross Blue Shield Ass'n.*, 224 F.3d 681, 684 (7th Cir. 2000)). Unless an employer acts for a forbidden reason, errors in its investigation "do not matter." *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir. 1996).

The Court agrees that PenFed's investigation of Mr. Moore was less than perfect. But it was not so flawed that PenFed failed to make "a reasonably informed and considered decision before taking an adverse employment action" against him. *See Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016).

14

By way of illustration, the Court addresses Mr. Moore's individual complaints about PenFed's investigatory and disciplinary processes:

- Mr. Moore's predecessor was fired because she was too loud, too tardy, and repeatedly fell asleep at her desk. *See generally* Dkt. 28-16. By contrast, Mr. Moore was fired because numerous employees accused him of sexual harassment. Mr. Moore's conduct appeared to present an imminent personal and dignitary risk to his coworkers, as well as potential legal liability for PenFed. Even though PenFed did not progressively discipline Mr. Moore, its failure "to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir. 1998), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47 (2000).

- The 2018 complaint PenFed received about Mr. Moore's harassing conduct was far more limited in scope than that which was revealed during the 2019 investigation. *See* Dkt. 28, at 12. The individual that identified Mr. Moore's problematic behavior in 2018 primarily outlined unease over his business ethics, and otherwise voiced concern only about his practice of asking women to take his coffee cup to the kitchen and his statement "that if it were legal, he would beat his wife for spending money." *Id.* Though PenFed "regrettably" did nothing in response to the complaint about Mr. Moore's harassing conduct, it did explore the ethics concerns raised by the complainant. *See* Dkt. 28-23, at 9–10.

- Mr. Moore significantly mischaracterizes Mr. Velky's deposition testimony to argue that PenFed "did not honestly believe Mr. Moore's conduct justified termination" because it approved of his comments. For one, Mr. Velky made clear that his views on the appropriateness of Mr. Moore's comments assumed that these comments were made in isolation. *See, e.g.*, Dkt. 28-24, at 17–18 (Q: Okay. How about the one comment that: You were bad in school . . . you must have been bad in school? Mr. Velky: Again, *likely one comment*, no.") (emphasis added). Mr. Moore also pulled a "bait and switch" while positing hypotheticals to Mr. Velky during his deposition. *Compare* Dkt. 28-24, at 15–16 ("Q: Is it chauvinistic for a male employee to ask an administrative assistant to – if they're – if they're going out, to let you know and so you can get me – 'cause I might – I – let me know because I – I'm busy and I might want a sandwich? Is that chauvinistic? Mr. Velky: [F]rom my perspective, no"), *with* Dkt. 23-4, at 2 ("Before leaving the office [Mr. Moore] noticed a Popeye's [sic] cup on Alexis's desk . . . Cary asked 'Alexis, is that a Popeye's [sic] cup?' Alexis said yes. [Mr. Moore] said 'I've told you that if you leave this office for lunch you are to ask me if I want anything'. [sic] Alexis said he was in a meeting. [Mr. Moore] responded 'I don't care. If it happens again I will fire you.'"), *and* Dkt. 23-12, at 6.

- That "[n]o employee made any complaints about Mr. Moore until [the investigation was launched] in November 2019" is no surprise. Dkt. 28, at 29. According to one former employee, Mr. Moore's power to take away his staff members' livelihoods was menacing. *See* Dkt. 23-12, at 7 ("I feel like people were intimidated by [Mr. Moore], which is why they didn't say anything . . . Like at the end of the day, [Mr. Moore] gives

you your job or takes your job. So I feel like if you're scared to say anything it was because he – like there was this cloud over your head that [Mr. Moore] would find out and [Mr. Moore] would fire you."). Recollection of this power dynamic caused the former employee to lose her composure on examination. *Id.* at 6 ("Mr. Nealon: Did [Mr. Moore] ever indicate that he might fire you if you didn't tell him you were going out for lunch? . . . Ms. Shifflett: Yeah, he had said like – like I came back from lunch one time with food and he said, you know, if you leave next time and you don't tell me like what you're eating or offering me any food, then like I'll have to fire you. And then after that I was like okay, well, he just said – . . . Mr. Nealon: Do you want to take a break? Ms. Shifflett: Sorry. And then after that I had started asking him, because I didn't want to lose my job, because I just had a son. Mr. Hantzes: Do you need to take like a five-minute break or something. You can do that. Ms. Shifflett: Are you sure?").

- Upon careful review, PenFed's failure to follow written procedures while investigating Mr. Moore evidences no pretext. "[A]n informal policy is no less a policy." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297–99 (4th Cir. 2010).

- "Ms. Cook shredded her handwritten notes she took during the interview," Dkt. 28, at 30, but only after many of these notes were typed into a Word document. Dkt. 28-23, at 13. That was Ms. Cook's practice. *Id.* at 25. Mr. Velky's testimony that he "personally" would have kept a copy of the notes expresses a mere difference in opinion. Mr. Moore argues that Ms. Cook "has no idea what happen [sic] to her handwritten *or typed notes and PenFed did not produce any.*" Dkt. 28, at 30. But this representation lacks support based on Ms. Cook's deposition testimony. *See* Dkt. 28-23, at 13. Even Mr. Moore's counsel appears to concede that at least some notes taken by Ms. Cook were typed into a Word document and produced. *See id.* at 23–24 ("Q: Nobody took notes of the interview with Mr. Moore; is that true? Ms. Cook: I believe there were notes, but I'm not certain. Q: Did you take notes during the meeting? Ms. Cook: I would have been the one taking notes. Q: Well, why didn't you type those notes up? *You typed these.*") (emphasis added).

- PenFed was not obligated to interview every potential witness or include statements from all witnesses that were not germane to its decisional process.

- Mr. Moore's complaint that "Ms. Cook knowingly included things in her Memorandum which she knew were not sexist or harassing" is without merit. *See* Dkt. 28, at 30. Mr. Moore specifically complains that the Cook Memorandum included his statement to Alexis Shifflett that she "must have been a bad kid in school." *Id.* This statement apparently embarrassed Ms. Shifflett in front of her peers, Dkt. 28-17, at 2, and so it was probative to PenFed's decision to terminate Mr. Moore.

- Whether Mr. Moore was fired by a committee or by an individual has nothing to do with whether his termination was based on his race.

Based on the foregoing analysis, the Court finds that Mr. Moore has failed to present evidence reasonably calling into question the honesty of PenFed's subjective belief that he needed to be ousted from the organization. *See Tomasello v. Fairfax Cty.*, 2016 WL 165708, at *11 (E.D. Va.

Jan. 13, 2016) (citing *DeJarnette*, 133 F.3d at 299).  Nothing in the record indicates anything but PenFed's "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.*  Because the Court finds that Mr. Moore has failed to demonstrate that PenFed's proffered justification was a mere pretext for discrimination,[7] Count II must fail. *McDonnell Douglas*, 411 U.S. at 802.

### C. Discrimination in the Enforcement of Employee Disciplinary Measures

Mr. Moore also raises a distinct claim in his opposition brief for Title VII racial discrimination in the enforcement of employee disciplinary measures. *Compare* Dkt. 28, at 26–27, *with Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).  This claim fails for the reasons set forth above.

Additionally, this claim was not contained in Mr. Moore's complaint. *Compare* Dkt. 1, at 8–9, ¶¶ 42–46, *with* Dkt. 28, at 26–27.  Discriminatory termination and discriminatory enforcement of employee disciplinary measures are separate causes of action. *See, e.g.*, *Mahomes v. Potter*, 590 F. Supp. 2d 775, 781 (D.S.C. 2008) ("[T]he elements of a *prima facie* case of disparate discipline are different from those elements needed to show a *prima facie* case of discriminatory discharge."); *Jones v. Southcorr, LLC*, 324 F. Supp. 2d 765, 776 n.11 (M.D.N.C. 2004), *aff'd sub nom. Jones v. Southcorr, LLC*, 117 F. App'x 291 (4th Cir. 2004) ("Defendant seems to request the Court to combine both claims into one *prima facie* case, with Plaintiff having to show disparate treatment either by showing that he was disciplined more harshly than a similarly situated white employee (discriminatory enforcement of disciplinary measures) or that he was replaced by a similarly situated white employee (discriminatory

---

[7] Or, as Mr. Moore titles the relevant section in his opposition brief, "Defendant Can Not Met Its Burden of Demonstrating Its Proffered Legitimate Rustication Is the True Reason for Its Tarnation of Plaintiff." Dkt. 28, at 28. A single proof might have identified at least one of the four typographical errors in this sentence.

discharge). . . . Because the elements of the *prima facie* cases are different, the Court will analyze Plaintiff's claims separately.").

PenFed understandably takes issue with Mr. Moore's tardy presentment of this new cause of action. *See* Dkt. 29, at 10 ("Defendants did not have an opportunity to conduct any discovery relating to Mr. Moore's new theory, and the Court should not permit Mr. Moore to pursue a new claim after discovery has closed and dispositive motions have been filed."). The Court agrees. Even if Mr. Moore's claim for Title VII racial discrimination in the enforcement of employee disciplinary measures were viable, the Court would not entertain it at this stage in the litigation. *See U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009)) ("[I]t is well established that a plaintiff may not raise new claims after discovery has begun without amending his complaint.").

### D. Retaliation in Violation of Title VII (Count III)

For Moore to establish a *prima facie* case of Title VII retaliation, he must demonstrate that "(1) that [he] engaged in a protected activity, (2) that [his] employer took an adverse employment action against [him], and (3) that there was a causal link between the two events." *See Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)). Title VII recognizes two forms of protected activity: participation activity and opposition activity. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Only opposition activity is relevant here. Opposition activity is defined expansively, and "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259 (citing *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981)); *see also DeMasters v.*

*Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (observing that "opposition activity" includes (1) complaining about unlawful practices to a manager, the union, or other employees, (2) informal protests of discriminatory employment practices, including making complaints to management, and (3) endeavoring to obtain an employer's compliance with Title VII); *id.* ("[A]n employee is protected when she opposes not only employment actions actually unlawful under Title VII but also employment actions she reasonably believes to be unlawful, and the Title VII violation to which the oppositional communication is directed may be complete, or it may be in progress.") (cleaned up).

Mr. Moore engaged in opposition activity by repeatedly reporting another employee's allegedly abusive conduct and harassment of a female coworker. *See* Dkt. 28, at 25. PenFed subsequently took adverse employment action against Mr. Moore. *Id.* ("The adverse action consists of [1] the termination of Mr. Moore as well as [2] the refusal of Mr. Vohra to communicate with Mr. Moore in response to his requests to meet to discuss compensation."). The closeness in time between these events establishes the *prima facie* element of causality. *See* Dkt. 28, at 25 ("The last time Mr. Moore complained about discrimination was in October of 2019 and the last time he reached out to discuss compensation was November 14, 2019. He was terminated December 3, 2019."); *see Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) ("While evidence as to the closeness in time [between the protected activity and adverse employment action] far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a *prima facie* case of causality."); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ("[V]ery little evidence of a causal connection is required to establish a *prima facie* case. In fact, we have held that merely the closeness in time

between the filing of a discrimination charge and an employer's firing an employee is sufficient to make a *prima facie* case of causality.) (cleaned up); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989) (finding that termination within three plus months of protected activity was sufficient to establish *prima facie* causality); *Francisco v. Verizon South, Inc.*, 756 F. Supp. 2d 705, 725 (E.D. Va. 2010) ("Circumstantial evidence [of retaliation] may be established by close temporal proximity."); *EEOC v. Reynolds Metals Co.*, 212 F. Supp. 2d 530, 537 (E.D. Va. 2002) ("In the case at bar, Moore filed a complaint in December, 1999, and Reynolds Metals imposed the MOU on January 10, 2000, suspended Moore on January 18, 2000, and terminated Moore on February 9, 2000. The proximity of these events leads to a conclusion that the Plaintiffs satisfy a *prima facie* claim of retaliation based on her discharge.").

Though Mr. Moore's termination is not actionable in Count III under the *McConnell Douglas* burden-shifting framework for the reasons stated above, an open question exists as to whether Mr. Moore can recover for Title VII retaliation based on "the refusal of Mr. Vohra to communicate with [him] in response to his requests to meet to discuss compensation." Dkt. 28, at 25. In the Court's view, PenFed fails to adduce any meaningful evidence of a legitimate and non-discriminatory reason for its failure to respond to Mr. Moore's salary inquiries. In fact, PenFed focuses its retaliation arguments almost entirely on Mr. Moore's termination. *See* Dkt. 23, at 13 ("Count III for Retaliation Fails Because Mr. Moore's Termination was not Related to his Alleged Protected Activity."); *see also* Dkt. 29, at 9. Owing to PenFed's failure to satisfy its burden of production at the second step of the *McDonnell Douglas* burden-shifting framework, the Court must deny summary judgment on Count III based solely on PenFed's failure to meet with Mr. Moore to discuss a salary increase.

### E. Limitation of Damages

Because the Court has dismissed Counts I and II and finds that Mr. Moore's Title VII

retaliation claim cannot proceed based on his termination, it need not decide whether Mr.

Moore's wage damages "should be limited to the 19 days from the date of his termination from

PenFed Title to the beginning of his employment with First Title." Dkt. 23, at 15 (citing *Brady*

*v. Thurston Motor Lines Inc.*, 753 F.2d 1269, 1279 (4th Cir. 1985)); *see also* 42 U.S.C. § 2000e-

5(g)(1).

## V.    CONCLUSION

For the reasons stated above, and for good cause shown, Defendants' motion (Dkt. 22) is

**GRANTED IN PART** and **DENIED IN PART**.  The Court **GRANTS** summary judgment on

Counts I and II and **DENIES** summary judgment **IN PART** on Count III.

It is **SO ORDERED**.

May 18, 2021                                              Liam O'Grady
Alexandria, Virginia                                      United States District Judge